AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

<table>
<tr><td>In the Matter of the Search of<br><br>THE PREMISES LOCATED AT: <b>2329 University Street, St. Louis, Missouri 63107 (subject location 4),</b> further described in Attachment A.</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 4:20 MJ 7213 SPM<br><br>SIGNED AND SUBMITTED TO THE COURT<br>FOR FILING BY RELIABLE ELECTRONIC MEANS</td></tr>
</table>

**FILED**

AUG 17 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

### APPLICATION FOR A SEARCH WARRANT

I, __James Gaddy__ , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

THE PREMISES LOCATED AT: **2329 University Street, St. Louis, Missouri 63107 (subject location 4),** further described in Attachment A.

located in the _____ EASTERN _____ District of _____ MISSOURI _____, there is now concealed

see <u>ATTACHMENT B.</u>

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ✓ evidence of a crime;
- ✓ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 841(a)(1), 846 | Conspiracy to possess with intent to distribute controlled substance(s); |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

- ✓ Continued on the attached sheet.
- ❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the foregoing is true and correct.

*Applicant's signature*

JAMES GADDY, Task Force Officer
DEA

*Printed name and title*

Sworn, to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: _____ August 17, 2020 _____

*Judge's signature*

City and State: _____ St. Louis, MO _____

Hon. Shirley P. Mensah, U.S. Magistrate Judge
*Printed name and title*
AUSA: John R. Mantovani

## ATTACHMENT A

*Properties to be searched*

a.      **Subject location 1 - 1319 14th Street, St. Louis, Missouri**: **Subject location 1** is described as a single family apartment within the Preservation Square Housing Complex. **Subject location 1** sits on the west side of the street with the front door facing east. **Subject location 1** is made of brick construction. The front door of subject location 1 is green with the address, "1319" is clearly posted on the door.  On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 1**.  The current utilities are subscribed to Sh'keena HARRIS, since November 2018.



2

b.      **Subject location 2 - 3209 Barrett, St. Louis, Missouri**: **Subject location 2** is

described as two story two family flat apartment.  **Subject location 2** sits on the north side of the

street with the front door facing south.  **Subject location 2** is made of red brick construction and

has a pitched roof.  **Subject location 2** has a large covered front porch on the 2nd story.  The

address, "3209" is clearly posted on the brick to the left of the door.  On August 11, 2020, an

inquiry with the local utility company was made regarding the account holder of **subject location**

**2**.  The current utilities are subscribed to **TyDarryl GRIFFIN**, since December 2016.



3

c.      **Subject location 3 - 3212 Harper, St. Louis, Missouri**: **Subject location 3** is described as a two story single family residence. **Subject location 3** sits on the south side of the street with the front door facing north. **Subject location 3** is made of brick construction and has a flat roof. The front door of **subject location 3** is white with the address, "3212", is clearly posted to the left of the door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 3**. The current utilities are subscribed to Reginald GRIFFIN, since May 2017.



4

      d.     **Subject location 4 - 2329 University, St. Louis, Missouri**: **Subject location 4** is described as a two story single family residence. **Subject location 4** sits on the north side of the street with the front door facing south. **Subject location 4** is made of brick construction and has a flat roof. The windows to the east of the front door have white security bars on them and the front yard is surrounded by a black wrought iron fence. The front door of **subject location 4** is brown with the address, "2329" posted above the door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 4**. The current utilities are subscribed to Charles Henderson, since October 2009.



e.  **Subject location 5 - 4430 San Francisco, St. Louis, Missouri**: **Subject location 5** is described as a single family residence. **Subject location 5** sits on the south side of the street with the front door facing north. **Subject location 5** is made of brick construction and has a pitched roof. The front door of **subject location 5** is dark in color with a white exterior door. **Subject location 5** has an attached garage to the east of the front door. The address "4430" is clearly posted to the left of the front door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of subject location 5. The current utilities are subscribed to Towanda Kent, since October 2014.



6

f.        **Subject location 6 - 1521 East Gano Avenue, St. Louis, Missouri:  Subject location 6** is described as a single family residence.  **Subject location 6** sits on the north side of the street with the front door facing south.  **Subject location 6** is made of brick construction and has a pitched roof.  The front door of **subject location 6** is brown in color with no exterior door.  **Subject location 6** has a side entrance on the east side of the residence.  The address "1521" is clearly posted to the right of the front door.  On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 6**.  The current utilities are subscribed to Malinda Jones, since September 2016.



## **ATTACHMENT B**

### *Property to be seized*

1.     All records and information relating violations of Title 21, United States Code, Sections 841(a) and 846, that constitutes fruits, evidence and instrumentalities of violations those violations involving **TyDarryl GRIFFIN** and others occurring during the conspiracy, including:

a. Controlled substances;

b. Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

c. Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

d. Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

e. Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

f. Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

g. United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

h. Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

i. Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

j. Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or locations described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

k. Firearms and/or weapons.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF )
**THE SUBJECT LOCATIONS** LOCATED )    No. 4:20 MJ 7210-7215 SPM
AT: **(1) 1319 14th Street, St. Louis, Missouri** )
**63106; (2) 3209 Barrett Street, St. Louis,** )    FILED UNDER SEAL
**Missouri 63107; (3) 3212 Harper Street, St.** )
**Louis, Missouri 63107; (4) 2329 University** )
**Street, St. Louis, Missouri 63107; (5) 4430** )
**San Francisco Avenue, St. Louis, Missouri** )
**63115; and (6) 1521 East Gano Avenue, St.** )
**Louis, Missouri 63107** )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, James Gaddy, being first duly sworn by reliable electronic means, hereby depose and

state as follows:

## INTRODUCTION, LOCATIONS TO BE SEARCHED, AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for warrants to search the following locations:

   a.    **1319 14th Street, St. Louis, Missouri 63106 (subject location 1);**

   b.    **3209 Barrett Street, St. Louis, Missouri 63107 (subject location 2);**

   c.    **3212 Harper Street, St. Louis, Missouri 63107 (subject location 3);**

   d.    **2329 University Street, St. Louis, Missouri 63107 (subject location 4);**

   e.    **4430 San Francisco Avenue, St. Louis, Missouri 63115 (subject location 5);**

   f.    **1521 East Gano Avenue, St. Louis, Missouri 63107 (subject location 6).**

Hereinafter all of these locations will collectively be referred to as the "**subject locations.**" Each

of the specific **subject locations** will be referred to by the subject location number listed above.

Further, each of the **subject locations** are further described and depicted in **Attachment A**, and the search will be for the things described in **Attachment B**.

2.      I am an investigative and law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.      I have been a deputized Task Force Officer with the Drug Enforcement Administration (DEA) since January of 2010 and am currently assigned to an Enforcement Group of the St. Louis Division Office.  I am a sworn police officer with the St. Charles County Police Department for the past approximately 15 years and was, prior to that, a sworn police officer with the Breckenridge Hills Police Department for the past approximately 5 years.

4.      During the course of my law enforcement experience, I have participated in numerous investigations involving controlled substances.  I have conducted investigations of a variety of illegal drug-trafficking and money-laundering organizations.  I have participated in investigations which led to the seizure of illegal drugs, weapons, and assets derived from the sale of illegal drugs, and the subsequent felony arrests of those individuals involved.  I have participated in several prior investigations involving Title III authorized wiretaps and have had specialized training from the United States Department of Justice, DEA, regarding telephone data exploitation. I have also participated in numerous drug-related training courses throughout my law enforcement career.  I am familiar with and have used normal methods of investigation, including, but not

2

limited to, visual and electronic surveillance, questioning of witnesses and defendants, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources and undercover agents, and the use of court-authorized wire intercepts.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant(s) and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a) and 846 (i.e. distribution, possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute controlled substances), hereinafter "the subject offenses", have been committed by **TyDarryl GRIFFIN, Keyshia HARRIS,** and/or other persons known and unknown.  There is also probable cause to search the properties described in **Attachment A** for evidence of these crimes and contraband or fruits of these crimes, as described in **Attachment B**.

## RELIABILITY OF CONFIDENTIAL SOURCE INFORMATION

7.     During the initial commencement of this investigation, members of the investigative team utilized information and assistance from two DEA Confidential Sources (hereinafter CS-1 and CS-2).  Both CS-1 and CS-2 have been cooperating with DEA since May 2019 in other unrelated investigations.  CS-1's and CS-2's cooperation has led to arrests, drug seizures, and indictments.  CS-1 has prior felony convictions for drug offenses and is being

3

financially compensated for his/her cooperation.  CS-2 has no prior felony convictions and being financially compensated for his/her cooperation.   CS-1 and CS-2 often work in tandem based on their underlying relationship.  The information provided by CS-1 and CS-2 has been corroborated and is believed to be reliable based upon law enforcement actions, controlled drug purchases, recorded and intercepted telephone conversations over the target telephone #1, recorded face-to-face meetings, telephone toll analysis, and other related intelligence ascertained throughout the investigation.  The information provided by both CS-1 and CS-2 has never been found to be false or misleading.

8.      During the instant investigation, investigators have also established CS-3.  CS-3 began cooperating with investigators during the instant investigation.  CS-3 has prior felony convictions for drug offenses and is cooperating for judicial consideration.  The information provided by CS-3 has been corroborated and is believed to be reliable based upon law enforcement actions, including recorded telephone conversations, recorded face-to-face meetings, pen register information,  and telephone toll analysis.  CS-3's corroborated information has not been found to be false or misleading and has been utilized in both the investigation of the **TyDarryl GRIFFIN** St. Louis-based DTO and other co-conspirators directed related to the instant investigation.[1]

---

[1]      As a result of Title III intercepts and continued investigative efforts, CS-3 was eventually identified as being one of many sources for **TyDarryl GRIFFIN**.  However, investigators learned **GRIFFIN** no longer utilizes CS-3 as a source and has acquired new unidentified sources.  This was confirmed through debriefings with CS-3 following his/her cooperation.  Currently, CS-3 was indicted and detained in the Western District of Missouri for related drug trafficking activities while cooperating with law enforcement.  Although CS-3 continued to be involved with drug-

4

## INVESTIGATION AND PROBABLE CAUSE

9.     The United States, including the DEA, is conducting a criminal investigation of the **GRIFFIN Drug Trafficking Organization** (**GRIFFIN DTO**), **TyDarryl GRIFFIN** (**GRIFFIN**), **Keyshia HARRIS (HARRIS)**, **Tyrone HARRIS**, and others known and unknown regarding the commission of the subject offenses.

10.     During the course of this investigation, DEA has obtained evidence of the drug conspiracy through the interception of wire and electronic communications over the following telephones: target telephone #1 (used by **Keyshia HARRIS**), target telephone #2 (used by Ron HILL), target telephones #3 and #4 (used by **TyDarryl GRIFFIN**) and target telephones #5 and #6, (used by Confidential Source-3, hereinafter: CS-3), pursuant to orders signed by District Court Judges of the Eastern District of Missouri between October 2, 2019, and the present. By February/March of 2020, investigators were able to secure CS-3's cooperation and began to utilize CS-3 in this investigation.

### A.     Background of Investigation.

11.     In January 2019, during a separate DEA St. Louis investigation (indicted under *United States v. Guy Goolsby et al*, Cause No. 4:19-CR-00412 AGF (PLC)), investigators learned of **Keyshia HARRIS'** (**HARRIS'**) involvement in the distribution of heroin and/or fentanyl in the

---

related activities while cooperating with law enforcement, the information CS-3 provided to investigators was verified by other law enforcement methods and found to be true and accurate.

St. Louis Metropolitan from a Source of Information ("SOI").   The SOI indicated **HARRIS** was a member of the violent St. Louis-based street gang the "270 Sullivan Mob."   The 270 Sullivan Mob is a criminal street gang that has been engaging in criminal activities in the area of the 2700 block of Sullivan Avenue in South St. Louis City for decades.   Additionally, the SOI believed **HARRIS** was being sourced with heroin and/or fentanyl by Guy GOOLSBY (GOOLSBY), another known member and source to the 270 Sullivan Mob.   In May of 2019, Goolsby was indicted in United States District Court – Eastern District of Missouri in a fifteen-person conspiracy for his involvement in large scale cocaine, heroin, and fentanyl trafficking from Mexico, through Texas and Florida, to the St. Louis area.   This is the same DEA investigation in which investigators initially learned of **HARRIS** drug trafficking activities.   At the present time, GOOLSBY is being held by the United States Marshal Service until his case is fully adjudicated.   On July 9, 2020, GOOLSBY pled guilty to conspiracy to distribute over 5 kilograms of cocaine, over 1 kilogram of heroin, and over 400 grams of fentanyl for his role in that drug conspiracy.   His sentencing hearing date is currently set on October 14, 2020.   Since GOOLSBY's indictment and confinement, investigators, through information from CS-1, CS-2, and CS-3, monitored Title III conversations, and numerous controlled purchases from **GRIFFIN**, **HARRIS,** and others, have learned **HARRIS** has continued to distribute ounce quantities of heroin/fentanyl and **GRIFFIN** is **HARRIS**' source of supply.   The investigation has revealed that **GRIFFIN** is now in control, at least in part, of overseeing aspects of the DTO's drug trafficking because the higher-ranking members of the hierarchy were detained as part of the Guy GOOLSBY prosecution.

6

12.    During the course of the investigation, investigators have utilized CS-1 and CS-2 to conduct fentanyl purchases from various members of the DTO through **HARRIS** in the City of St. Louis at numerous drug houses utilized by the DTO.[2] As described in greater-detail below and throughout the investigation, the following number of transactions have occurred at the following locations.  Two fentanyl purchases occurred at **1319 14th Street, St, Louis, Missouri (subject location 1)**.  Four fentanyl purchases occurred at **3209 Barrett, St. Louis, Missouri (subject location 2)** with one involving **3212 Harper, St. Louis, Missouri (subject location 3)**.  One fentanyl purchase occurred at **2329 University, St. Louis, Missouri (subject location 4)**.  One fentanyl purchase occurred at **4430 San Francisco, St. Louis, Missouri (subject location 5)**.  Two fentanyl purchases occurred at **1521 East Gano, St. Louis, Missouri (subject location 6)**. Further, three fentanyl purchases have occurred at 3502 Natural Bridge, St. Louis, Missouri.  However, since that purchase investigators learned **GRIFFIN** has transitioned from using the residence at 3502 Natural Bridge to using **subject location 2.**  As described in further detail below and in 2020,

---

[2]    Through training, experience, and instant investigation, I am aware that a DTO of this sophistication and size will utilize multiple drug storage/distribution locations to limit the daily foot and automobile traffic to and from one particular location to avoid suspicion and thwart any potential law enforcement investigation.  This was evident in the **GRIFFIN DTO** through the multiple controlled fentanyl purchases we have conducted. Those fentanyl transactions have consistently taken place at different locations such as **subject locations 1, 2, 4, 5,** and **6**.  Additionally, the sheer number of houses used by the DTO, keeps daily foot and vehicle traffic to and from one particular subject location at a minimum causing difficulty for investigators to focus on one or two locations.  Investigators have been forced to focus their attention on six different drug distribution/storage houses.

**GRIFFIN** completed the renovation of 3502 Natural Bridge and has since rented that residence to tenants.[3]

**B.      August 7, 2019 Fentanyl Purchase: Subject location 1.**

13.      On August 7, 2019, investigators directed CS-1 and CS-2 to arrange for the purchase of fentanyl from **HARRIS**. During the recorded call to **HARRIS**, **HARRIS** instructed CS-1 and CS-2 to come over to **subject location 1** in order to complete the fentanyl transaction. Investigators provided CS-1 and CS-2 with $600.00 Official Advanced Funds (OAF) and covert recording equipment. Investigators followed CS-1 and CS-2 directly to **subject location 1**, where investigators witnessed **HARRIS** exit the front door of **subject location #1** and meet with CS-1 and CS-2. Shortly thereafter, investigators observed known fentanyl distributor Jermaine JOHNSON arrive and make contact with **HARRIS**. Following **HARRIS'** and JOHNSON's brief interaction, **HARRIS** re-engaged with CS-1 and CS-2. Moments later, **HARRIS** returned inside **subject location 1,** and CS-1 and CS-2 departed **subject location 1**. Investigators met with CS-1 and CS-2 who informed investigators that JOHNSON had resupplied **HARRIS** with fentanyl and **HARRIS** then provided CS-1 and CS-2 their requested fentanyl order. CS-1 and CS-2 believed

---

[3]      I know from my training and experience, that high-level drug traffickers who make substantial profits from drug distribution buy properties to use as "stash-houses" and distribution hubs for a short periods of time. Once the property has been used for some time, they renovate, then sell/rent the property, and move their drug distribution to another residence. This not only can make what appears to be legitimate profits for the DTO but also can chill law enforcement's ability to identify a specific property, investigate it and interdict that distribution before the DTO transitions to another residence. Further, during the renovation process it would not appear out of the ordinary for numerous people and vehicles to be arriving and departing the residence and therefore making law enforcement detection of a specific distribution house more difficult.

8

**HARRIS** had also acquired an additional amount of fentanyl from JOHNSON for **HARRIS** to independently distribute from **subject location 1**. The purchased fentanyl was later submitted to the St. Louis City Metropolitan Crime Laboratory for analysis, which revealed it was 5.705 grams of fentanyl.

### C.   Surveillance of Subject Location 1.

14.     Based on investigators' knowledge that **HARRIS** utilized **subject location 1** as her primary residence and a drug distribution location, investigators have conducted numerous hours of surveillance at **subject location 1**. As a result of that surveillance and the herein described controlled fentanyl purchases, investigators believe that **HARRIS** has established **subject location 1** as her primary residence. Through surveillance, investigators have witnessed on several occasions, **HARRIS** exit **subject location 1** when different vehicles pulled up in front of her house. **HARRIS** then entered and exited that vehicle quickly taking just enough to time to conduct a quick transition of drugs for money. On other occasions, I have seen **HARRIS** enter a vehicle. That vehicle would then travel around the block and drop **HARRIS** back off at **subject location 1** just a few moments later. From my training, experience, **HARRIS**' known drug trafficking activities, and her brief interactions with the occupants of the vehicles, I believe she was conducting street-level fentanyl transactions. Her tactic of entering the vehicle and then being driven around the block is solely to avoid law enforcement witnessing **HARRIS** and the unknown drug purchaser occupying a parked vehicle for a short period of time.

9

**D.     August 19, 2019 Fentanyl Purchase: Subject Locations 2, 3, & 3502 Natural Bridge.[4]**

15.     In morning hours of August 19, 2019, investigators directed CS-1 and CS-2 to arrange another purchase of fentanyl from **HARRIS**.  During the recorded call to **HARRIS**, CS-1 requested $600 worth of fentanyl.  **HARRIS** instructed CS-1 to pick-up **HARRIS** at a medical facility in the City of St. Louis.  Investigators provided CS-1 with $600.00 (OAF) and covert recording equipment.  Investigators followed CS-1 directly to the medical facility and observed **HARRIS** enter CS-1's vehicle.  Investigators then followed CS-1 and **HARRIS** to the 3200 block of Barrett Street, which contains **subject location 2**.  Once they arrived, investigators witnessed **HARRIS** exit CS-1's vehicle and proceed on foot south through residential yards to **3212 Harper** (**subject location 3**), which is one block south of **subject location 2**'s 3200 block of Barrett Street.

16.     Investigators were able to establish long-range surveillance of **subject location 3** and observed **HARRIS** meeting with **TyDarryl GRIFFIN** in front of **subject location 3**. Moments later, investigators observed a white Dodge Avenger, bearing Missouri license plate JB3-P5Z, being driven and solely occupied by **GRIFFIN's** known distributor/stash house operator

---

[4]     **Subject locations 2, 3,** and 3502 Natural Bridge are within a block or two of each other in the JeffVanderLou neighborhood of North St. Louis City.  All been identified as being owned by and/or directly associated with **GRIFFIN**.  Furthermore, I believe the close proximity of the identified drug houses is to assist the DTO by allowing members to transport the drug and/or money supply quickly from one subject location to another to reduce and limit law enforcement's ability to collect intelligence and pin-point the primary drug and/or money stash.

10

Barnard REED (REED,)  REED arrived at **subject location 3** and made contact with **HARRIS** and **GRIFFIN**.

17.     Shortly thereafter, investigators observed **GRIFFIN** enter a black Cadillac Escalade bearing Michigan license plate DSY-5266, registered to EAN Holding (Enterprise Leasing).  Moments later, **GRIFFIN**, operating the Cadillac Escalade, and REED, operating the Dodge Avenger departed the area, driving in tandem.[5]  While the majority of investigators established moving surveillance of **GRIFFIN** and REED, some investigators maintained surveillance of **HARRIS** and CS-1.  Upon **GRIFFIN**'s and REED's departure, investigators observed **HARRIS** began to walk through the residential yards northbound from Harper back to Barrett and enter CS-1's front passenger seat.

18.     Moving surveillance of the Cadillac Escalade and Dodge Avenger led investigators to the area of 3502 Natural Bridge Ave., which is one block south of Harper (**subject location 3**) and two blocks south of Barrett (**subject location 2**).[6]

---

[5]     Based on my training, experience, and the instant investigation, I am confident **GRIFFIN** and REED drove in separate vehicles to make any surveillance difficult and force investigators to monitor two different vehicles.  This also doubled the ability of **GRIFFIN** and/or REED to attempt detect any law enforcement presence trying to follow them.

[6]     At the time of this controlled purchase, **GRIFFIN** was renovating 3502 Natural Bridge while simultaneously using 3502 Natural Bridge as a "stash house."  Investigators conducted the August 19, the October 7, and the October 16, 2019 (as described below) fentanyl purchases at 3502 Natural Bridge.  During these transactions, investigators were able to observe that construction/renovation was also occurring at the residence.  By January of 2020, **GRIFFIN** had completed the renovation and rented 3502 Natural Bridge to tenants who do not appear to be involved in the DTO or drug distribution.  Those tenants acquired utilities in their name(s) in January 2020.  The next fentanyl purchase

11

19.     Investigators observed the Dodge Avenger park directly in front of 3502 Natural Bridge. **GRIFFIN** parked at an adjacent BP Gas Station and walked over to 3502 Natural Bridge. Investigators observed both **GRIFFIN** and REED enter 3502 Natural Bridge. Several minutes later, investigators observed **GRIFFIN** and REED exit 3502 Natural Bridge and depart the area in separate directions. **GRIFFIN** returned back to **subject location 3**, and REED drove to 3200 Barrett Street (the street of **subject location 2**).

20.     Upon REED's arrival to the 3200 block of Barrett, investigators observed **HARRIS** exit CS-1's vehicle and make contact with REED. Investigators observed **HARRIS** and REED conduct a quick hand-to-to-hand transaction, and then **HARRIS** returned to CS-1's vehicle. **HARRIS** quickly entered and then exited the vehicle. Moments later, CS-1 departed the area leaving **HARRIS** in the area of Barrett and Harper.

21.     Investigators met with CS-1 and recovered the purchased fentanyl along with the covert recording equipment. The purchased fentanyl was later submitted to the St. Louis City Metropolitan Crime Laboratory for analysis, which revealed it was 5.279 grams of fentanyl.

**E.      October 16, 2019 Fentanyl Purchase: 3502 Natural Bridge and Subject Location 5.**

22.     On October 2, 2019, United States District Court Judge Henry E. Autrey, Eastern District of Missouri, issued an order authorizing the interception of wire and electronic

---

from **GRIFFIN** occurred on January 15, 2020 at **subject location 2**. This supports my belief that **GRIFFIN** distributes fentanyl from his residences that he is currently renovating in order to avoid law enforcement detection.

communications to and from target telephone #1, known to be utilized by **HARRIS** (Cause No. 4:19 MC-00720-HEA).   Interception of this telephone was initiated on October 2, 2019 and terminated on October 31, 2019.

23.     On or about October 16, 2019, using CS-1, investigators conducted a one-ounce fentanyl purchase from **GRIFFIN** and/or REED, facilitated by **HARRIS**.  CS-1 placed a recorded call to target telephone #1 used by **HARRIS** in order to orchestrate the fentanyl transaction. During the recorded conversation, **HARRIS** directed CS-1 to pick **HARRIS** up from her place of employment located 9904 Page Avenue, St. Louis, Missouri.   At approximately 4:00 p.m., investigators observed **HARRIS** exit her place of employment and enter CS-1's vehicle. Investigators followed **HARRIS** and CS-1 to the North St. Louis area.

24.     On October 16, 2019, investigators intercepted an exchange of text messages (Call Sessions: 1206 and 1209) between **HARRIS**, using target telephone #1 and **GRIFFIN**, which was the preparation for the fentanyl transaction.   Based on the investigative team's training and experience, the parenthetical remarks within any of the following transcripts are the investigative team's interpretation of the coded language used by the participants of the intercepted call/text. During these text, the following was intercepted:

a.      October 16, 2019 – 3:56 p.m.: Outgoing text message to **GRIFFIN** from target telephone #1.

**HARRIS**:              650 ($650.00) on my way (to 3502 Natural Bridge) now

b.      October 16, 2019 – 4:06 p.m.: Incoming text message from **GRIFFIN**, used by target telephone #1.

13

**GRIFFIN**:              Ok (acknowledging the fentanyl transaction and its location)

Through training, experience, and the instant investigation, investigators believe the two text messages between target telephone #1, used by **HARRIS,** and **GRIFFIN** consisted of **HARRIS** informing **GRIFFIN** that **HARRIS** was in route to 3502 Natural Bridge to procure a quantity of fentanyl when **HARRIS** texted, "650 on my way now." **GRIFFIN** followed up with a text back to **HARRIS** acknowledging the transaction.

25.    Investigators followed CS-1 and **HARRIS** directly to the 3500 block of Natural Bridge, where CS-1 parked directly across the street from 3502 Natural Bridge. Immediately, **HARRIS** exited CS-1's vehicle and walked directly to the front door of 3502 Natural Bridge. **HARRIS** knocked and, moments later, investigators observed REED open the door and let **HARRIS** into 3502 Natural Bridge.

26.    While **HARRIS** was inside 3502 Natural Bridge, investigators monitored an outgoing call from target telephone #1, used by **HARRIS** to CS-1 (Call Session: 1210). Based on the investigative team's training and experience, the parenthetical remarks within any of the following transcripts are the investigative team's interpretation of the coded language used by the participants of the intercepted call/text. During this call, the following was intercepted:

   a.  October 16, 2019 – 4:23 p.m.: Outgoing call from target telephone #1, used by **HARRIS** to CS-1.

      **HARRIS**:        He (**GRIFFIN**) only got the straight pure (uncut and/or unadulterated fentanyl), you know what I'm (**HARRIS**) saying?

14

CS-1:                    Yeah

[**HARRIS** had side conversation with REED present inside 3502 Natural Bridge]

> **HARRIS** to REED:   how much you (REED) selling that (pure fentanyl) for
> (cost)?  That you (REED) gave me (pure fentanyl)?...Oh she
> ain't going to pay that much (expensive fentanyl).

[**HARRIS** returned to conversation with CS-1]

> **HARRIS**:           He (REED) said 12 (cost for the fentanyl).
>
> CS-1:                Ok.

Through training, experience, and the instant investigation, investigators believe the conversation

between **HARRIS** over target telephone #1, CS-1, and REED who was present at 3502 Natural

Bridge consisted of **HARRIS** informing CS-1, **GRIFFIN** and REED only had pure unadulterated

fentanyl, when **HARRIS** stated, "he only got the straight pure."  Investigators believe **HARRIS**

wanted to make certain CS-1 did not mind the pure fentanyl instead of the "cut" or diluted fentanyl.

27.     Approximately 15 minutes later, **HARRIS** exited from the rear of 3502 Natural

Bridge and walk directly to CS-1's vehicle to re-enter same.  **HARRIS** directed CS-1 to drop

**HARRIS** off at "Louie's" (**Tyrone HARRIS**) residence at **4430 block of San Francisco, St.**

**Louis, Missouri** (**subject location 5**).  CS-1 believed **HARRIS** had procured an additional amount

of fentanyl from 3502 Natural Bridge.  CS-1 and investigators believe **HARRIS** acquired an

additional amount to deliver to **Tyrone HARRIS** (**HARRIS'** brother and **GRIFFIN's** distributor)

15

at **subject location 5** once **HARRIS**' transaction with CS-1 was completed. The purchased fentanyl was later submitted to the DEA Drug Laboratory for analysis, and I am awaiting the results.

      **F.**      **November 4, 2019 Fentanyl Transaction: Subject Location 2.**

      28.      On November 1, 2019, United States District Court Judge Audrey G. Flessig, Eastern District of Missouri, issued an order authorizing the interception of wire and electronic communications to and from target telephone #3, known to be utilized by **GRIFFIN** (Cause No. 4:19 MC-848-AGF). Interception of this telephone was initiated on November 4, 2019 and terminated on December 5, 2019. Results of the intercepted communications obtained pursuant to this order are discussed in more detail below and demonstrate **GRIFFIN** used target telephone #3 strictly for drug-related matters.

      29.      On or about November 4, 2019, investigators monitored a series of communications (Call Sessions: 2 and 6) between **GRIFFIN**, using target telephone #3, and Cassidy GARTH (C. GARTH), a courier for **GRIFFIN**'s initial source of supply, using Illinois-based telephone number (618) 746-1938. During these intercepted calls, **GRIFFIN** requested that C. GARTH "bring one," to Barrett (**subject location 2**), which investigators believe consisted of a GRIFFIN's request for a specific quantity of fentanyl. Based on the investigative team's training and experience, the parenthetical remarks within any of the following transcripts are the investigative team's interpretation of the coded language used by the participants of the intercepted call/text. The following calls were intercepted:

16

a.   **November 4, 2019 – 6:53 p.m.** (Call Session: 2): Outgoing call to Illinois-based number (618) 746-1938, used by C. GARTH from **GRIFFIN** using target telephone #3.

| | |
|---|---|
| **GRIFFIN**: | Okay. I'm still finna go down there (**subject location 2**). |
| C. GARTH: | Yeah, where you (**GRIFFIN**)…where you (**GRIFFIN**) want me (C. GARTH) to go (deliver quantity of fentanyl)? |
| **GRIFFIN** | Let me go…most likely it's (drug transaction) gon' be on Barrett (**subject location 2**). 'Cause, I finna head (travel to the **subject location 2**). |
| C. GARTH: | A'ight. |
| **GRIFFIN**: | I'mma be down there (target location) like about 15 minutes. And, I'mma call you back…see what he (unidentified customer) trying to get (purchase a quantity of fentanyl). |

b.   **November 4, 2019 – 8:02 p.m.** (Call Session: 6): Outgoing call to Illinois-based number (618) 746-1938, used by C. GARTH, from **GRIFFIN** using target telephone #3.

| | |
|---|---|
| **GRIFFIN**: | Do you (C. GARTH) want…do you want to bring (deliver) one (quantity of drugs) down here (target location) for a lil' bro (unidentified customer)? |
| C. GARTH: | Yeah, what'd you (**GRIFFIN**) say…bring (deliver) one (quantity of fentanyl) down (to target location)? |
| **GRIFFIN**: | Yeah, he's (unidentified customer) trying to get (purchase) one (quantity of fentanyl). |

17

Through training, experience, and the instant investigation, investigators believe the intercepted calls between C. GARTH and **GRIFFIN** consisted of **GRIFFIN** requesting C. GARTH deliver "one" (a quantity of fentanyl) to **subject location 2** for an unidentified customer.

30. Armed with the above intercepted call between **GRIFFIN** and C. GARTH, investigators attempted to physically surveil the meeting at **subject location 2**. However, investigators were unable to arrive to the area prior to C. GARTH's departure from **subject location 2** and were unsuccessful in observing the meeting or identifying **GRIFFIN**'s unknown distributor/customer.

### G.      November 15, 2019 Drug Proceed Collection: Subject Location 2

31. On November 15, 2019, investigators intercepted an outgoing call (Call Session: 323) from target telephone #3 used by **GRIFFIN** to CS-3.[7] During the conversation, **GRIFFIN** and CS-3 discussed the arrival of a drug shipment. Based on the investigative team's training and experience, the parenthetical remarks within any of the following transcripts are the investigative team's interpretation of the coded language used by the participants of the intercepted call/text. During this call, the following was intercepted:

a.      **November 15, 2019 – 9:17 a.m.** (Call Session: 323): Incoming call to **GRIFFIN** using target telephone #3 from CS-3.

CS-3:                              Man, I was just letting you (**GRIFFIN**) know, we (CS-3's Organization) back (arrival of new drug

---

[7]      This intercepted conversation between **GRIFFIN** and CS-3 occurred prior to CS-3's knowledge of the on-going investigation and prior to CS-3 beginning to cooperate with law enforcement.

|  | shipment)...that first even better (high quality fentanyl). They (CS-3's distributors and customers) were sayin' niggas (fentanyl) like new Jordan's had dropped boy. |
|---|---|
| **GRIFFIN**: | Well shit, that's what I uh need to do (acquire fentanyl from CS-3's recent drug shipment). |
| CS-3: | That new one (new drug shipment) is all the way in your lane (will be to **GRIFFIN**'s satisfaction). |
| **GRIFFIN**: | Alright, but then just tell her (C. GARTH) this, tell her (C. GARTH) to uh...I think she (C. GARTH) said she made like about eleven ($11,000 profit) off that last (previous drug shipment)...tell her (C. GARTH) imma bring (money) her (C. GARTH) uh...call her (C. GARTH), tell her imma bring that (profits) at eleven ($11,000). Tell her (C. GARTH) if she (C. GARTH) could, or if you (CS-3) could just float (give on consignment) me (**GRIFFIN**) one (kilogram) more... |
| CS-3: | Yeah (acknowledge **GRIFFIN**'s proposition). |
| **GRIFFIN**: | And then I will give you (CS-3) the rest (owed drug proceeds) on the back end (after the sale of the new drug shipment)...tell her (C. GARTH) that I'm on my way down there (**subject location 2**)...I finna be on Barrett (**subject location 2**) in like 15 minutes. |
| CS-3: | Barrett (**subject location 2**) in like 15 minutes (verifying meet location CS-3 will send C. GARTH)? |
| **GRIFFIN**: | Yeah...she (C. GARTH) know (has prior knowledge of the **subject location 2**). |

Through training, experience, and the instant investigation, investigators believe the conversation

between **GRIFFIN** and CS-3 was to discuss the arrival of the higher quality fentanyl shipment

19

that arrived to the St. Louis Metropolitan area.  During the call, CS-3 proudly compared the new

drug shipment as good as "new Jordans'" (expensive Nike sport shoes referencing the former NBA

basketball star Michael Jordan and re-noun for their quality and desirability.)  As the conversation

progressed, **GRIFFIN** discussed payment arrangements for the new drug shipment and requested

CS-3 to direct C. GARTH to **subject location 2** to collect the drug proceeds.

32.    On the same day and armed with the above intercepted call, investigators

immediately proceeded to the area of **subject location 2** to observe the transaction.    As

investigators were arriving to the area of **subject location 2**, investigators observed **GRIFFIN**'s

known black GMC Sierra pickup truck parked directly in front of **subject location 2**.  Moments

later, investigators observed a silver in color Honda Pilot being driven by a female (believed to be

C. GARTH) arrive at **subject location 2**.  As investigators observed the female believed to be C.

GARTH walking up towards **subject location 2**.  Minutes later, the female and **GRIFFIN** exited

the residence, the female re-entered the silver Honda Pilot, and she departed the area.  **GRIFFIN**

re-entered **subject location 2**, and surveillance was terminated.

**H.    November 14, 2019 Intelligence Regarding Subject Location 3.**

33.    On November 14, 2019, while monitoring "GPS" coordinates of target telephone

#3, investigators noticed **GRIFFIN** had travelled to Polk County, Iowa for unrelated court

proceedings.  During the evening hours of November 14, 2019, investigators noticed **GRIFFIN**

was travelling back towards the St. Louis area from Iowa.  At that time, investigators directed the

St. Charles County Police Department to effect a traffic stop of **GRIFFIN**.  **GRIFFIN**, driver and

20

sole occupant of his black GMC Sierra, was stopped on southbound Highway 61 in St. Charles County, Missouri. During the traffic stop, officers could smell an odor of burnt marijuana emanating from **GRIFFIN**'s vehicle. A search was conducted and officers located court documentation of a court hearing in Polk County, Iowa, mail addressed to "**GRIFFIN** Holding LLC, **3212 Harper, St. Louis, Missouri** (**subject location 3**)" and two cellular devices. Investigators also learned **GRIFFIN** uses **subject location 3** as his address on his State of Missouri drivers license and is also directly linked to **subject location 3** through law enforcement databases.[8] Moreover, this discovery of "**GRIFFIN** Holding LLC" confirmed investigators belief **GRIFFIN** utilized his profits from the sale of drugs to purchase several residences within the City of St. Louis under the company "GRIFFIN Holding LLC", such as **subject locations 2, 3,** and 3502 Natural Bridge. Additionally, **GRIFFIN** utilizes these residences as ever-changing "stash houses" for the sole purpose of distributing and storing drugs. This was evident based on the numerous hours of surveillance, Title III wire intercepts, and controlled fentanyl purchases from **subject location 2** and 3502 Natural Bridge. Investigators believe **GRIFFIN** is now utilizing

---

[8]     As mentioned above, since May 2017, Reginald GRIFFIN, a relative of **TyDarryl GRIFFIN,** is the utility account holder for **subject location 3**. However, it appears from Missouri Department of Revenue records that Reginald GRIFFIN is deceased. Investigators are familiar that drug traffickers at the level of **TyDarryl GRIFFIN** will seldom use their actual name or information to connect them to a particular location and/or vehicle. Furthermore, drug traffickers will use the names of family and friends or even use the names of fictitious person(s) to register motor vehicles, acquire utilities for residences, and subscribe for cellular devices. The sole purpose of this tactic is to avoid exposure of their ability to acquire multiple residences and vehicles with their drug profits and/or avoid law enforcement detection.

**subject location 3** as his primary residence instead of **subject location 2** as a result of information gained during the May 14, 2020 fentanyl purchase at **subject location 2** further detailed below.

      **I.**      **January 15, 2020 Fentanyl Purchase: Subject Locations 1 and 2.**

      34.      On January 15, 2020, investigators directed CS-1 to arrange a purchase of $500.00 of heroin/fentanyl from **HARRIS**.  In presence of investigators, CS-1 placed an outgoing recorded call to **HARRIS** to discuss the potential heroin/fentanyl purchase.  **HARRIS** directed CS-1 to pick up **HARRIS** from **subject location 1**.

      35.      CS-1 was provided $500.00 Official Advanced Funds (OAF) in order to purchase the heroin/fentanyl from **HARRIS** and equipped with a covert recording device.  Followed and observed by investigators, CS-1 traveled directly to **subject location 1**.

      36.      At approximately 2:30 p.m., investigators observed **HARRIS** exit **subject location 1**, enter CS-1's vehicle, and depart the area.  Investigators covertly followed.  CS-1 drove directly to the area of **subject location 2**.  CS-1 parked approximately 50 yards from the **subject location 2**.  Moments later, investigators observed **GRIFFIN**'s black GMC Sierra pick-up arrive and park directly in front of **subject location 2**.  **GRIFFIN** exited his vehicle and entered **subject location 2**.  Simultaneously, investigators observed **HARRIS** exit CS-1's vehicle and proceeded on foot towards **subject location 2**.  **HARRIS** approached and then entered **subject location 2**.  Several minutes later, **HARRIS** exited **subject location 2** and proceeded to walk back to and reenter CS-1's vehicle.  With investigators covertly following, CS-1 drove back to **subject location 1.** **HARRIS,** still in possession of portion of the buy money CS-1 had paid her, entered **subject**

**location #1**. CS-1 departed the area and travelled directly to the pre-determined location, with investigators following. CS-1 relinquished the purchased heroin/fentanyl and covert recording device. The purchased heroin/fentanyl was later submitted to the DEA North Central Laboratory for analysis. Results are still pending.

### J.     March 2020 Intelligence Regarding Subject Location 2.

37.     During the instant investigation, investigators established CS-3 who was originally identified as being one of **GRIFFIN**'s source of supply for fentanyl, heroin, and cocaine. During a proffer interview in March 2020, CS-3 confirmed he/she supplied **GRIFFIN** with multiple kilogram quantities of fentanyl, heroin, and cocaine for several months. CS-3 indicated he/she arranged for the delivery and oversaw the drug transactions which took place at **subject location 2**. Additionally, CS-3 explained he/she had directed couriers to **subject location 2** in order to collect drug payments from **GRIFFIN**. CS-3 explained **subject location 2** was a drop-off location for drugs, but also appeared as if **GRIFFIN** was renovating **subject location 2**. CS-3 believed **GRIFFIN** utilized **subject location 2** as his primary residence but was also aware **GRIFFIN** purchases multiple dilapidated residences within the City of St. Louis. CS-3 state that he/she believed that **GRIFFIN** utilized the residences as "stash house" while the residences were being renovated.[9]

---

[9]     From training and experience, I am aware of drug traffickers, such as **GRIFFIN** utilize residences for a short period of time and transition to another residence to avoid law enforcement detection.

**K.    May 14, 2020 Fentanyl Purchase: Subject Locations 1 and 2.**

38.    On May 14, 2020, investigators directed CS-1 to arrange a purchase of $800.00 worth of heroin/fentanyl from **HARRIS**.  In presence of investigators, CS-1 placed an outgoing recorded call to **HARRIS** to discuss the potential heroin/fentanyl purchase.  **HARRIS** directed CS-1 to pick up **HARRIS** down the street from **subject location 1**.

39.    CS-1 was provided $800.00 Official Advanced Funds (OAF) in order to purchase the heroin/fentanyl from **HARRIS** and equipped with a covert recording device.  Investigators observed **HARRIS** depart from **subject location 1** and start walking.  Followed and observed by investigators, CS-1 traveled directly to **HARRIS'** location, just few blocks from **subject location 1**.

40.    At approximately 2:30 p.m., investigators observed **HARRIS** enter CS-1's vehicle and depart the area.  Investigators covertly followed.  CS-1 drove directly to the 3200 block of Barrett, where CS-1's vehicle parked just a few houses west of  **subject location 2**.  Investigators observed **GRIFFIN** standing on the front porch of **subject location 2** communicating with an unknown male occupying a white Chrysler 300 that was parked directly in front of **subject location 2**.  Moments later, investigators observed **HARRIS** exit CS-1's vehicle and proceed on foot towards **subject location 2**.  As **HARRIS** approached the front door to **subject location 2**, **HARRIS** and **GRIFFIN** greeted each other and entered **subject location 2**.  Several minutes later, **HARRIS** exited **subject location 2** and proceeded to walk back to and re-enter CS-1's vehicle.

24

41.     Investigators monitoring the covert recording/transmitting device worn by CS-1 were able to overhear **HARRIS** explain to CS-1 that she (**HARRIS**) was only able to acquire approximately "four grams" and "he" (**GRIFFIN**) was sending for more.   Armed with the overheard intelligence, investigators prepared for the departure of **GRIFFIN** and/or the unknown driver of white Chrysler 300.

42.     Minutes later, the unknown male driving the Chrysler 300 departed at a high rate of speed from **subject location 2**.   While a few investigators maintained surveillance of CS-1's vehicle and **subject location 2**, the majority of investigators attempted to follow the Chrysler 300. During the attempted surveillance of the Chrysler, investigators had great difficulty maintaining the surveillance because of the unknown male's erratic and unsafe driving behavior.   For the safety of the community and to avoid law enforcement being detected, the surveillance of the Chrysler 300 was terminated.

43.     Approximately 45 minutes later, investigators observed the white Chrysler 300 arrive back to the immediate area of **subject location 2**.   Investigators observed the driver of the Chrysler 300 meet with another unknown male occupying a black Chrysler 300 a few blocks away from **subject location 2**.   Following a brief encounter, investigators observed both Chrysler 300s depart in separate ways, with the black Chrysler 300 pulling up directly in front of **subject location 2**.   At that time, the unknown male occupying the black Chrysler 300 and **GRIFFIN** meet briefly in front of **subject location 2.**   The black Chrysler 300 then departed the area.   Investigators observed **GRIFFIN** re-enter **subject location 2**.

25

44.     Minutes later, investigators observed **HARRIS** exit from CS-1's vehicle and walk back towards the **subject location 2**.  Again, **HARRIS** entered **subject location 2.** A few minutes later **HARRIS** exited **subject location 2** and returned to CS-1's vehicle.  Shortly thereafter, **HARRIS** exited CS-1's vehicle, and CS-1 and investigators departed the area.

45.     Once at the pre-determined covert location, CS-1 relinquished the purchased heroin/fentanyl and covert recording device over to investigators.  The purchased heroin/fentanyl was submitted to the DEA North Central Laboratory for later analysis.  Results are still pending.  According to CS-1, **GRIFFIN** only had initially approximately four grams of fentanyl left and directed his "runner" who was driving the white Chrysler 300 to re-stock his supply.  Furthermore, at one point, **HARRIS** explained to CS-1 that the "runner" (the driver of the white Chrysler 300) observed law enforcement in the immediate area of **subject location 2** and made other arrangements (the driver of the black Chrysler 300) to hand over the fentanyl to **GRIFFIN** at **subject location 2**.

L.     **GRIFFIN's Residence Transition from Subject Location 2 to Subject Location 3.**

46.     Since law enforcement was spotted during the May 14, 2020 fentanyl transaction at **subject location 2**, investigators believe **GRIFFIN** is now primarily residing at **subject location 3**.  Until that transaction, **GRIFFIN** was frequently present at **subject location 2** during all hours of the day and night.  Although **GRIFFIN** is still occasionally present at **subject location 2** briefly to oversee day-to-day drug trafficking operations, I believe that **GRIFFIN** is distancing

26

himself from **subject location 2**.  During recent surveillance of **subject locations 2** and **3**, investigators are still observing a large amount of vehicle traffic coming and going from **subject location 2**.  Although it appears that **GRIFFIN** is distancing himself from **subject location 2** in an attempt to avoid liability, drug operations from **subject location 2** have continued. Furthermore, during spot-surveillances of **subject locations 2 and 3**, investigators have noticed **GRIFFIN**'s maroon Chevrolet Impala parked directly in front of **subject location 3** during overnight hours.  Furthermore, **GRIFFIN** has provided the address of **subject location 3** to Missouri Department of Revenue (DOR) as being his place of residency.  Moreover, as recent as July 23, 2020, investigators conducting early morning spot-surveillance of the all of **subject locations**, observed **GRIFFIN**'s maroon Chevrolet Impala parked in front of **subject location 3** and also observed **GRIFFIN** exit from **subject location 3** to talk to a neighbor wearing what appeared to be clothing a person would wear to bed.  Based on his use of **subject location 3** as his residence, investigators believe **subject location 3** will contain drugs, drug paraphernalia, documentation, drug ledgers, United States currency and/or receipts that will verify his drug trafficking activities as described below.

**M.     July 23, 2020 Fentanyl Purchase: Subject Locations 1, 4, 5, and 6.**

47.     On July 23, 2020, investigators directed CS-1 to arrange a purchase of $400.00 worth of heroin/fentanyl from **HARRIS**.  In presence of investigators, CS-1 placed an outgoing recorded call to **HARRIS** to discuss the potential heroin/fentanyl purchase.  **HARRIS** directed CS-1 to conduct the transaction at **subject location 1**.  During the recorded call, **HARRIS**

27

indicated she would have the desired amount of fentanyl and "they (CS-1 and **HARRIS**) wouldn't have to trip (drive to another place) to get it (fentanyl).[10]"

48.     Armed with the intelligence the transaction would take place at **subject location 1**, investigators established surveillance in the vicinity of **subject location 1**. As investigators arrived to the area, investigators observed a silver Dodge Journey, solely occupied by an unidentified male (UM-1). Investigators observed UM-1 approach and knock on the door to **subject location 1**. Moments later, **HARRIS** opened the door, met UM-1 outside, and conducted what appeared to be a hand-to-hand transaction. Shortly thereafter, **HARRIS** returned inside of **subject location 1** and UM-1 departed the area. A portion of investigators attempted to follow UM-1 occupying the Dodge Journey. However, due to UM-1's erratic and unsafe driving behavior, investigators were forced to terminate the moving surveillance of the Dodge Journey.

49.     After UM-1 left the area, **HARRIS** called CS-1, explained she (**HARRIS**) was ready for the transaction, and directed CS-1 to come to **subject location 1**. At this time, CS-1 and investigators were still under the impression the fentanyl transaction would be fully completed with **HARRIS** at **subject location 1**.

---

[10]     Investigators believe **HARRIS** maintains smaller amounts of fentanyl at **subject location 1** for street-level deals, which would explain why **HARRIS** told CS-1 that they would not need to drive anywhere for a $400 purchase. Investigators further believe the amount of fentanyl **HARRIS** needed to complete an individual sale would dictate which of the **subject locations HARRIS** would need to travel to acquire that specific amount. Additionally, since **GRIFFIN** has been proven to be the source to **HARRIS** and other members of the DTO, **subject locations 2** and **3** maintain the larger quantities, while **subject locations 1, 4, 5,** and **6** maintain street-level to mid-level amounts for distribution.

28

50.     CS-1 was provided $400.00 OAF in order to purchase the heroin/fentanyl from **HARRIS** and equipped with a covert transmitting device.  Followed and observed by investigators, CS-1 traveled directly to **subject location 1**.  **HARRIS** exited **subject location 1** and entered CS-1's vehicle.  CS-1 and **HARRIS** then departed the area.  While monitoring the conversation between CS-1 and **HARRIS** over the transmitting device, investigators overheard **HARRIS** altering the original plan and directing CS-1 to **subject location 4** to acquire a partial amount of fentanyl CS-1 requested.  I believe that **HARRIS** was forced to alter the original plan because **HARRIS** had exhausted her on-hand fentanyl supply with a sale to UM-1.  Additionally, investigators were able to overhear **HARRIS** attempting to place outgoing calls to **HARRIS'** unidentified "nephew" to acquire the fentanyl for CS-1.  However, **HARRIS'** "nephew" did not answer the telephone so **HARRIS** directed CS-1 to **subject location 4**.

51.     CS-1 drove directly to **subject location 4**, where investigators observed **HARRIS** approach and entered **subject location 4**.  Moments later, **HARRIS** exited **subject location 4** and reentered CS-1's vehicle.  CS-1 and **HARRIS** departed the area followed by investigators.

52.     Investigators continued to monitor the conversations between CS-1 and **HARRIS**. From the overheard conversation, **HARRIS** had acquired a portion of CS-1's requested amount from **subject location 4**.  Investigators overheard **HARRIS** then direct CS-1 to her brother, **Tyrone HARRIS'** residence at **subject location 5** in order to acquire the remaining amount of fentanyl CS-1 requested.

29

53.    Surveilling investigators followed CS-1 and **HARRIS** directly from **subject location 4** to **subject location 5**. Upon their arrival to **subject location 5**, **HARRIS** exited CS-1's vehicle and entered **subject location 5**. Moments later, investigators observed **HARRIS** and her brother **Tyrone HARRIS** exit **subject location 5** and enter CS-1's vehicle. CS-1's vehicle then departed the area occupied by CS-1, **HARRIS**, and **Tyrone HARRIS**. Investigators covertly followed.

54.    Again, investigators monitoring the transmitting device worn by CS-1, overheard **Tyrone HARRIS** providing the remaining amount of fentanyl to CS-1, and he requested that CS-1 drive **Tyrone HARRIS** to the area of **subject locations 2** and **3**. Investigators followed CS-1's vehicle directly to the area of **subject locations 2** and **3**, where **Tyrone HARRIS** exited CS-1's vehicle and proceeded out of the sight of the investigators. CS-1's vehicle, now only occupied by CS-1 and **HARRIS,** departed the area followed by investigators.

55.    Investigators then overheard **HARRIS** speaking to an unknown person over her cellular device, which, based on the conversation, was believed to be **HARRIS'** "nephew" that **HARRIS** had attempted to contact earlier. **HARRIS** was overheard saying "I needed get something from you and you wouldn't answer." Continuing to follow CS-1's vehicle, occupied by **HARRIS**, led investigators directly to **subject location 6**. Upon their arrival, **HARRIS** exited CS-1's vehicle, approached, and entered the side door to **subject location 6.** Moments later, **HARRIS** exited **subject location 6** and reentered CS-1's vehicle. CS-1 and **HARRIS** departed the area. Investigators covertly followed.

30

56.     The overheard conversation following the departure from **subject location 6** consisted of **HARRIS** indicating she had acquired approximately ½ ounce of fentanyl from her "nephew" at **subject location 6**. Her "nephew" was the same person she had tried to get a hold of on their way to **subject location 4**, but he had not answered his phone.

57.     Investigators followed CS-1 and **HARRIS** directly back to **subject location 1**, where **HARRIS** exited CS-1's vehicle and entered **subject location 1**. CS-1 departed **subject location 1** and proceeded to an undisclosed covert location to meet with investigators.

58.     While at the undisclosed location, CS-1 relinquished two separate clear bags containing suspected fentanyl. CS-1 indicated one bag of fentanyl came from **subject location 4**, while the other bag of fentanyl was procured from **Tyrone HARRIS** at **subject location 5**. CS-1 confirmed **HARRIS** was originally attempting to call her "nephew" at **subject location 6** in order to acquire the fentanyl. However, **HARRIS**' nephew did not answer his telephone. CS-1 explained **HARRIS** had to go to **subject locations 4** and **5** instead from **HARRIS**' "nephew" to get the fentanyl CS-1 requested. CS-1 indicated **HARRIS** eventually spoke to her "nephew," and directed CS-1 to **subject location 6** to procure approximately ½ ounce of fentanyl for **HARRIS** to distribute to others from **subject location 1**. The two bags of suspected fentanyl was transferred to DEA North Central Laboratory for analysis. Results are still pending.

### N.     July 28, 2020 Fentanyl Purchase: Subject Locations 1 and 2.

59.     On July 28, 2020, investigators directed CS-1 to arrange a purchase of $300.00 worth of heroin/fentanyl from **HARRIS**. In presence of investigators, CS-1 placed an outgoing

recorded call to **HARRIS** to discuss the potential heroin/fentanyl purchase. **HARRIS** directed CS-1 to pick up **HARRIS** from **subject location 1**, and they would travel to acquire the fentanyl.

60.     Armed with the intelligence **HARRIS** was presently at **subject location 1** waiting for CS-1's arrival, investigators established surveillance in the vicinity of **subject location 1**. As investigators arrived to the area, investigators observed **HARRIS'** daughter, Sh'keena HARRIS, exit **subject location 1** and approach the passenger side of a waiting gold Chevrolet passenger vehicle. Following a brief conversation with the driver, Sh'keena HARRIS returned back inside **subject location 1**. Moments later, Sh'keena HARRIS exited and reengaged with the parked gold Chevrolet passenger vehicle. However, this time, Sh'keena HARRIS entered and sat in the front passenger seat, with the door remaining open. Following a brief encounter with the driver, Sakeena HARRIS exited the vehicle and returned to the inside of **subject location 1**. The gold Chevrolet passenger vehicle departed the area.[11]

61.     At that time, **HARRIS** called CS-1 again, explained she (**HARRIS**) was ready, and directed CS-1 to **subject location 1**.

62.     CS-1 was provided $300.00 OAF in order to purchase the heroin/fentanyl and equipped with a covert transmitting/recording device. Followed and observed by investigators,

---

[11]     During previous debriefings of CS-1 and CS-2, they have indicated Sh'keena **HARRIS** does distribute smaller amounts of fentanyl. However, her primary source of income is from the sale of prescription medication such as Xanax and OxyContin. Based on investigators experience and observations of Sh'keena **HARRIS** action on July 28, 2020, investigators believe Sh'keena **HARRIS** was conducting a drug transaction with the driver of the gold in color Chevrolet passenger vehicle.

CS-1 traveled directly to **subject location 1**. **HARRIS** exited **subject location 1** and entered CS-1's vehicle. CS-1 and **HARRIS** departed the area. While monitoring the conversation between CS-1 and **HARRIS** over the transmitting device, I overheard **HARRIS** directing CS-1 to meet an unidentified subject, referred to as "Red" by **HARRIS**. **HARRIS** explained "Red" is one of her smaller suppliers that **HARRIS** had acquired fentanyl from during the July 23, 2020 fentanyl transaction (described above.) Based on intelligence gathered throughout the instant investigation, the overheard conversations between CS-1 and **HARRIS,** and the observed July 23, 2020 fentanyl transaction, I believe "Red" is the "stash house" operator for **subject location 4** or her "nephew" at **subject location 6.** However, during the overheard conversation, **HARRIS** indicated she was just meeting "Red" briefly to acquire money and would go meet her "bigger dude" (**GRIFFIN**) for the fentanyl for this transaction.

63.     At approximately 1:03 p.m., investigators followed CS-1 and **HARRIS** directly from **subject location 1** to the 2800 block of Thomas in the City of St. Louis. Investigators observed **HARRIS** exit CS-1 vehicle and make contact with the driver/sole occupant of a black Nissan Altima (believed to be "Red" based on the overheard conversation between **HARRIS** and CS-1.) Following a brief conversation, **HARRIS** re-entered CS-1's vehicle and departed the area. Investigators covertly followed.

64.     Surveillance followed CS-1 and **HARRIS** from the 2800 block of Thomas directly to **subject location 2**. During the trip from 2800 block of Thomas to **subject location 2**, investigators overheard **HARRIS** indicating to CS-1, "they (**HARRIS** and CS-1) [were] going to

33

the dude (**GRIFFIN**) on Barrett (**subject location 2**)."  **HARRIS** explained, "he (**GRIFFIN**) is the person I go to get the big stuff, like when you (CS-1) order larger amounts."  "This dude (**GRIFFIN**) always has it."  **HARRIS** continued confirming the identity of "her dude" to investigators by stating her "dude" (**GRIFFIN**) is litigating a child custody case in Iowa and fighting for his parental rights so he had been "slow" until now.[12]

65.   Once CS-1 and **HARRIS** arrived to the area of **subject location 2**, investigators observed CS-1's vehicle briefly stop in front of **subject location 2** and **HARRIS** exited CS-1's vehicle.  **HARRIS** then approach **subject location 2**.  CS-1's vehicle then pulled away from **subject location 2** and parked on the south side of the street.  Investigators observed **HARRIS** walking around the front of **subject location 2** and observed **GRIFFIN** exit **subject location 2's** front door.  **GRIFFIN** entered a blue Chevrolet Equinox, bearing Missouri license "NC3-G7U" which was parked in front of **subject location 2**.[13]  **HARRIS** followed **GRIFFIN** and entered the front passenger side of the Chevrolet Equinox.  Moments later, investigators observed **HARRIS** exit the Chevy Equinox, run back to, and re-enter CS-1's vehicle.  Once **HARRIS** exited the

---

[12]    Investigators believe that **HARRIS'** reference to **GRIFFIN** being "slow", was **HARRIS** implying that **GRIFFIN** had been primarily focused on his on-going litigation.  That litigation had a brief, but negative effect on his productivity in securing and selling drugs.  However, investigators believe that **HARRIS** was explaining that **GRIFFIN** had now reestablished his focus on his drug operations.

[13]    The Chevrolet Equinox, bearing Missouri license plate NC3-G7U is registered to Reginald GRIFFIN at 3212 Harper, St. Louis, Missouri (**subject location 3**).  As previously detailed within the instant affidavit, Reginald GRIFFIN is the deceased relative of **GRIFFIN** who is also the listed utility holder for **subject location 3**.

Chevrolet Equinox, the vehicle being driven/solely occupied by **GRIFFIN**, immediately drove off

traveling west on Barrett. Roving covert surveillance was maintained on the Chevrolet Equinox.

66.     Shortly thereafter, investigators observed **HARRIS** exit CS-1's vehicle and return

to the area of **subject location 2**. Once **HARRIS** was out of CS-1's vehicle, CS-1 drove off.

While the majority of investigators continued to follow the Chevrolet Equinox being driven by

**GRIFFIN**, a portion of investigators followed CS-1 to a pre-determined meeting location after the

transaction. Once at the pre-determined meeting location, CS-1 relinquished the heroin/fentanyl

and covert transmitting/recording device to investigators. CS-1 was debriefed. CS-1 stated once

he/she picked up **HARRIS** from **subject location 1**, **HARRIS** directed CS-1 to the 2800 block of

Thomas. **HARRIS** told CS-1 she (**HARRIS**) was meeting "Red" who owes her money. **HARRIS**

further stated "Red" sells heroin/fentanyl and was one of the distributors **HARRIS** procured from

during last deal (July 23, 2020). However, "Red" didn't have any fentanyl at that moment. After

**HARRIS** and "Red" met, **HARRIS** directed CS-1 to Barrett (**subject location 2**). CS-1 indicated

once they (CS-1 and **HARRIS**) arrived to Barrett, **HARRIS** exited the vehicle and CS-1 observed

**HARRIS** eventually entered a dark colored Sports Utility Vehicle with a tall, bald male

(**GRIFFIN**). Moments later, CS-1 stated he/she observed **HARRIS** exit the SUV and get back

into CS-1's vehicle. CS-1 stated once inside the vehicle, **HARRIS** handed him/her a clear plastic

bag containing heroin/fentanyl. CS-1 further stated **HARRIS** got an additional $500.00 worth of

fentanyl from the driver of the SUV (**GRIFFIN**) for **HARRIS** to distribute to others. CS-1 stated

**HARRIS** told him/her she was going to stay on Barrett and hang out with "family." CS-1 stated

**HARRIS** exited the vehicle, and he/she drove off.  The purchased fentanyl from **GRIFFIN** through **HARRIS** at **subject location 2** was transferred to the DEA North Central Laboratory for analysis.  Results are still pending.

67.     The moving surveillance of **GRIFFIN** led investigators to a storage facility "A-1 U Store It", located 2645 Dunn Road, St. Louis, Missouri.  **GRIFFIN** entered the storage facility and began to work on an older yellow Chevrolet, which investigators believe **GRIFFIN** is storing at that facility.  Surveillance was terminated.

      **O.**     **July 29, 2020 Surveillance: Subject Locations 2, 3, 4, 5, and 6.**

68.     Starting at the early morning hours of July 29, 2020, investigators conducted surveillance of the **subject locations** detailed within the instant affidavit.  Initially, investigators conducted spot-surveillance of **subject location 2**, where investigators observed **GRIFFIN**'s previously mentioned black GMC Sierra pick-up parked within a fenced in area of **subject location 2**.  Investigators then drove to **subject location 3**, where investigators observed the Chevrolet Equinox (which **GRIFFIN** had been driving during the fentanyl transaction on July 28, 2020) parked directly in front of **subject location 3**.  Surveillance was performed at **subject locations 4, 5, and 6** and investigators observed foot and vehicle traffic consistent with street-level drug sales.  However, a lengthy duration of surveillance could not be accomplished without investigators being seen and potentially compromising the investigation.  Investigators were forced to terminate surveillance at each of those locations because obvious "lookouts" in numerous vehicles were performing counter-surveillance by circling the city blocks.  Those "look-outs:

noticeably focused on investigators window-tinted and unfamiliar vehicles in that were in the immediate area.

    **P.**    **July 31 and August 3, 2020, Fentanyl Acquisitions from Subject Location 6.**

    69.    On or about July 31, 2020, CS-1 contacted me and detailed a transaction that CS-1 had witnessed between **HARRIS** and her "nephew" at **subject location 6**. CS-1 informed me that prior to that date, **HARRIS** had requested that CS-1 provide **HARRIS** with transportation to and from **subject location 6**. **HARRIS** told CS-1 that **subject location 6** is **HARRIS'** "sister's" and "nephew's" residence.[14] CS-1 explained he/she was aware that **HARRIS** and **HARRIS'** daughter Sh'keena were having maintenance issues with an automobile they (**HARRIS** and Sh'keena HARRIS) typically utilized. Based on that information and at that time, CS-1 believe he/she was only assisting **HARRIS** with normal, non-drug related transportation. During the trip to **subject location 6**, **HARRIS** called her "nephew" and explained that she (**HARRIS)** was coming to see him (**HARRIS'** "nephew"). However, CS-1 overheard **HARRIS** tell her "nephew" she was coming over to acquire fentanyl. Prior to that call, CS-1 did not know that he/she was transporting

---

[14]    Throughout the instant affidavit, I state that **subject location 6** is inhabited by **HARRIS'** "sister" and "nephew." However, investigators have been unable to identify a "sister" or "nephew" associated with **HARRIS**. Based on his/her prior relationship with **HARRIS**, CS-1 has intimate intelligence concerning **HARRIS** and **HARRIS'** family. Investigators questioned CS-1 about the identity of **HARRIS'** "sister" and "nephew" residing at **subject location 6.** CS-1 explained **HARRIS** does have a sister. However, **HARRIS'** sister does not live the State of Missouri. CS-1 indicated **HARRIS** refers to close associates, friends, and/or those person(s) who **HARRIS** had grown-up with since childhood as being her "brothers" and "sisters." CS-1 called these friends/associates **HARRIS'** "play-sisters" and "play-brothers." Moreover, the children of **HARRIS'** "sisters" and "brothers" are also referred to as **HARRIS'** "nephews" and "nieces." The lack of actual familial, blood, or legal ties to the residents of **subject location 6** may be why investigators have been unable to identify the residents of **subject location 6**.

**HARRIS** to acquire fentanyl because CS-1 had not ordered any fentanyl for investigators that day. When **HARRIS** & CS-1 arrived, **HARRIS** entered **subject location 6** from the same side door she entered on the July 23, 2020 fentanyl transaction. CS-1 stated that **HARRIS** was inside **subject location 6** for just a few minutes and then returned to CS-1's vehicle. As **HARRIS** entered the vehicle, CS-1 observed **HARRIS** pull a baggie filled with approximately ½ ounce (14 grams) of fentanyl. CS-1 stated he/she then dropped **HARRIS** back off at **subject location 1**. Prior to **HARRIS** contacting her nephew on the drive to **subject location 6**, CS-1 stated he/she was unaware of why **HARRIS** wanted CS-1 to transport **HARRIS** over to **subject location 6**. Immediately after dropping off **HARRIS** at **subject location 1**, CS-1 contacted me and informed me of **HARRIS'** trip to acquire fentanyl from **subject location 6**. I informed CS-1 that if **HARRIS** should call for a ride, even one that was not specifically stated to be for fentanyl acquisition, CS-1 should notify investigators to initiate surveillance.

70.      On August 3, 2020 at approximately 3:00 p.m., CS-1 contacted me and explained **HARRIS** had just called CS-1 and requested a ride over to **subject location 6**. Although **HARRIS** did not specifically tell CS-1 that **HARRIS** was going to get fentanyl, CS-1 contacted me per my instructions. Armed with the above intelligence, investigators established surveillance in the vicinities of **subject location 1** and **subject location 6**. At approximately 3:30 p.m., CS-1 arrived to **subject location 1.** Shortly thereafter **HARRIS** exited the residence and entered CS-1's vehicle. Investigators then followed the CS-1 and **HARRIS** directly to **subject location 6**, **HARRIS'** "nephew's" residence. Investigators observed **HARRIS** exit CS-1's vehicle and enter

38

**subject location 6** by using the side door.  Moments later, **HARRIS** exited the residence and re-entered CS-1 vehicle.  CS-1 and **HARRIS** departed the area, ultimately returning to **subject location 1**.  **HARRIS** exited CS-1 vehicle and entered **subject location 1**.  CS-1 departed the area where investigators debriefed CS-1 at an undisclosed location.

71.     During that debrief on August 3, 2020, CS-1 explained once **HARRIS** entered CS-1 vehicle, **HARRIS** directed CS-1 to travel to her "nephew's" (**subject location 6**), where **HARRIS** was to pick up some fentanyl.  Once they (**HARRIS** and CS-1) arrived to **subject location 6, HARRIS** told CS-1 that she would be right back.  **HARRIS** entered the side door to **subject location 6**.  Minutes later, CS-1 stated **HARRIS** reappeared from **subject location 6** from the side door and returned to CS-1 vehicle.  Just as the July 31, 2020 trip to **HARRIS**' "nephew's" (**subject location 6**), **HARRIS** pulled out approximately ½ ounce (14 grams) of fentanyl from **HARRIS** pants pocket and hid the bag of fentanyl within her brassiere.  CS-1 stated he/she then dropped **HARRIS** off at **subject location 1**.

Q.     **August 6, 2020 Fentanyl Purchase: Subject Location 1.**

72.     On August 6, 2020, investigators directed CS-1 to arrange a purchase of $400.00 worth of heroin/fentanyl from **HARRIS**.  In presence of investigators, CS-1 placed an outgoing call to **HARRIS** to discuss the potential heroin/fentanyl purchase.  **HARRIS** directed CS-1 to come over to **subject location 1**.  During the call, **HARRIS** explained she had enough fentanyl at

**subject location 1** to fill CS-1's order.[15]  Armed with the intelligence the transaction would take place at **subject location 1**, investigators established surveillance in the vicinity of **subject location 1**. This surveillance was also assisted and recorded by the DEA Air-wing in a fixed wing aircraft overhead.

73.      CS-1 was provided $400.00 OAF in order to purchase the heroin/fentanyl and equipped with a covert transmitting device. Followed and observed by investigators, CS-1 traveled directly to **subject location 1**. **HARRIS** then exited **subject location 1** and entered CS-1's vehicle. While CS-1 and **HARRIS** remained parked, I overheard **HARRIS** ask CS-1 "how much you want to spend?" I then overheard **HARRIS** ask CS-1 for a scale. Continuing and at investigators' earlier direction, CS-1 discussed purchasing multiple ounces fentanyl at one time. Also at investigators direction, CS-1 explained he/she liked the quality of fentanyl that came from **subject locations 4 and 5** from the July 23, 2020 fentanyl transaction. **HARRIS** indicated she (**HARRIS**) was capable of acquiring multiple ounces easily and could acquire the fentanyl from each of the **subject locations** CS-1 had bought from in the past (**subject locations 2, 4, 5, and 6**).

---

[15]      As explained throughout the instant affidavit, I believe **HARRIS**, **Tyrone HARRIS**, the unidentified distributor(s) at **subject location 4**, and **HARRIS**' "nephew" maintain a few ounces of fentanyl on-hand at **subject locations 1, 4, 5, and 6** to fill smaller drug orders. **GRIFFIN** utilizes his primary residence, **subject location 3**, and **subject location 2** to maintain larger amounts fentanyl. This is believed to be due to the fact that **GRIFFIN,** the source of supply for the **GRIFFINI DTO,** directly controls **subject locations 2 and 3**. **Subject locations 1, 4, 5, and 6** are operated by **GRIFFIN**'s lower-level distributors and are not permitted to maintain and keep larger amounts of drugs.

However, **HARRIS** specifically stated that her "dude (**GRIFFIN**) on Barrett (**subject location 2**) supplies all the spots (**subject locations 1, 2, 4, 5, and 6.**)"[16]

74.   A few minutes later, **HARRIS** exited CS-1's vehicle and re-entered **subject location 1**. CS-1, followed by investigators, departed the area and traveled directly to a covert location. CS-1 relinquished the purchased fentanyl and transmitting device. During CS-1's debriefing, CS-1 indicated **HARRIS** had brought out a larger bag of fentanyl and requested to use CS-1's scale to weigh out CS-1's order. After fulfilling CS-1's order, **HARRIS** had several more grams of fentanyl remaining. CS-1 indicated **HARRIS** was able to acquire multiple ounces of fentanyl and the "guy on Barrett" (**GRIFFIN**) supplies all the "stash houses" (**subject locations 1, 2, 4, 5, and 6**). The purchased fentanyl was transferred to the DEA North Central Laboratory for analysis. Results are still pending.

### R.   August 10, 2020 Fentanyl Purchase: Subject Locations 1, 2, and 6.

75.   On August 10, 2020, I directed CS-1 to arrange a purchase of $2500.00 worth of heroin/fentanyl from **HARRIS**. In the presence of investigators, CS-1 placed an outgoing recorded call to **HARRIS** to discuss the potential heroin/fentanyl purchase. **HARRIS** directed CS-1 to pick up **HARRIS** from **subject location 1** in order to travel to acquire the fentanyl. Investigators specifically requested substantially more fentanyl from **HARRIS** to investigate

---

[16]   This statement corroborates my belief that **GRIFFIN**, using **subject locations 2 and 3,** is the overarching supplier for **HARRIS at subject location #1**, the unidentified distributor at **subject location 4**, **Tyrone HARRIS** at **subject location #5**, and **HARRIS'** "nephew" at **subject location 6**.

where **HARRIS** would have to travel to fulfill CS-1's order and to attempt to uncover the amounts of fentanyl being stored at the different **subject locations** at a specific time.

76.     Armed with the intelligence **HARRIS** had directed CS-1 to **subject location 1**, investigators established surveillance in the vicinity of **subject location 1**. This surveillance was also assisted and recorded by the DEA Airwing in an overhead, fixed-wing aircraft.

77.     CS-1 was provided $2500.00 OAF in order to purchase the heroin/fentanyl and equipped with a covert transmitting/recording device. Followed and observed by investigators, CS-1 traveled directly to **subject location 1**. **HARRIS** exited **subject location 1** and entered CS-1's vehicle. CS-1 and **HARRIS** departed the area of **subject location 1**.

78.     Followed and observed by investigators, CS-1 and **HARRIS** traveled directly to a new location, 3966 Lexington, St. Louis, Missouri. Investigators observed **HARRIS** exit CS-1's vehicle and enter 3966 Lexington. Upon arrival, investigators observed **GRIFFIN's** blue Chevrolet Equinox with Missouri license plate NC3-G7U parked directly in front of 3966 Lexington. Furthermore, investigators also noticed 3966 Lexington was currently being renovated.[17]

---

[17]     Based on **HARRIS** directing CS-1 to 3966 Lexington, which was previously unknown to CS-1 and/or investigators, I called CS-1 to gather intelligence while **HARRIS** was in the house in an attempt to discern why CS-1 and **HARRIS** went to that address. CS-1 indicated **HARRIS** had ordered an ounce from the "guy on Barrett" (**GRIFFIN**) and was procuring the ounce from this location (3966 Lexington.) As described throughout the instant affidavit, 3966 Lexington fits the pattern of **GRIFFIN**'s tactic to use residences currently being renovated as a cover to facilitate the distribution of fentanyl and/or launder his drug profits.

79.     Moments later, investigators observed **HARRIS**, **GRIFFIN**, and an unidentified male (UM-2) exit from 3966 Lexington.  **HARRIS** entered CS-1's vehicle, **GRIFFIN** entered his maroon Chevrolet Impala, which was parked around the corner from the Lexington address, and UM-2 entered **GRIFFIN's** Chevrolet Equinox.  All parties departed the area.  However, **HARRIS** and CS-1 traveled in different directions from **GRIFFIN** and UM-2.  While majority of investigators continued to follow **HARRIS** and CS-1, a few investigators followed and observed **GRIFFIN** in the Chevrolet Impala and UM-2 in **GRIFFIN's** Chevrolet Equinox travel directly to **subject location 2**.  Both **GRIFFIN** and UM-2 entered **subject location 2**.

80.     While majority of investigators continued to follow **HARRIS** and CS-1, I overheard **HARRIS** explain to CS-1 that **GRIFFIN** did not have the entire ounce at Lexington and was going "to get the dope."  **HARRIS** indicated they (**HARRIS** and CS-1) would go to her "nephew's" at **subject location 6** to procure a portion of CS-1's order while **GRIFFIN** packaged the rest (and larger amount) of the order at **subject location 2**.

81.     Investigators followed and observed CS-1 and **HARRIS** travel directly to **subject location 6**, where **HARRIS** exited CS-1's vehicle and entered **subject location 6**.[18]  A few minutes later, **HARRIS** reappeared and entered CS-1's vehicle.  **HARRIS** and CS-1 departed the area.

---

[18]     Again, as **HARRIS** exited CS-1's vehicle, I called CS-1 to gather additional intelligence.  CS-1 explained the "guy from Barrett" (**GRIFFIN**) did not have an entire ounce of fentanyl on-hand at the Lexington residence and directed **HARRIS** to meet him (**GRIFFIN**) over "at Barrett" (**subject location 2**) to procure the full ounce of fentanyl.

43

82.     Continuing to maintain covert surveillance, investigators followed and observed CS-1 and **HARRIS** travel directly to **subject location 2**. **HARRIS** exited CS-1's vehicle and entered **subject location 2**. Moments later, **HARRIS**, **GRIFFIN**, and UM-2 exited **subject location 2**. **HARRIS** re-entered CS-1's vehicle and they departed the area. **GRIFFIN** and UM-2 were also observed entering **GRIFFIN's** maroon Chevrolet Impala and departing. Investigators observed **GRIFFIN** and UM-2 travel directly back to and re-enter 3966 Lexington. The other group of investigators observed CS-1 and **HARRIS** travel directly back to **subject location 1**. Upon CS-1 and **HARRIS'** arrival back to **subject location 1,** investigators observed **HARRIS** enter **subject location 1,** and the CS-1 departed the area.

83.     Investigators met CS-1 at a covert location where CS-1 relinquished the purchased fentanyl and the covert recording/transmitting device. CS-1 indicated they (**HARRIS** and CS-1) travelled over to Lexington where **HARRIS** met "the dude from Barrett" (**GRIFFIN**). **HARRIS** returned to the vehicle and explained he (**GRIFFIN**) did not have a full ounce at Lexington and would have to go get it. **HARRIS** indicated they (**HARRIS** and CS-1) could travel to **HARRIS'** "nephew's" at **subject location 6** to procure some of the order prior to meeting with **GRIFFIN** at **subject location 2** to complete the order. After acquiring fentanyl from **subject location 6**, **HARRIS** directed CS-1 to travel over to "Barrett" (**subject location 2**) to pick up the rest of the order. Once CS-1 and **HARRIS** arrived on Barrett (**subject location 2**), CS-1 observed **HARRIS** enter **subject location 2**. **HARRIS** soon exited and provided the rest of the fentanyl order to CS-

44

1 in CS-1's vehicle. CS-1 then drove **HARRIS** back to **subject location 1**. CS-1 did not know where **GRIFFIN** or the UM-2 were going to travel when they exited **subject location 2**.

S.    **August 12, 2020 Fentanyl Purchase: Subject Locations 1 and 6.**

84.    On August 10, 2020, I directed CS-1 to arrange a purchase of $1500.00 worth of heroin/fentanyl from **HARRIS**. In presence of investigators, CS-1 placed an outgoing recorded call to **HARRIS** to discuss the potential heroin/fentanyl purchase. **HARRIS** directed CS-1 to pick up **HARRIS** from **subject location 1** in order to travel to acquire the fentanyl. Investigators again specifically requested a large amount of fentanyl from **HARRIS** to investigate where **HARRIS** would have to travel to fulfill CS-1's order to attempt to uncover the amounts of fentanyl being stored at the different **subject locations** at a specific time.

85.    Armed with the intelligence **HARRIS** had directed CS-1 to **subject location 1,** investigators established surveillance in the vicinity of **subject location 1**. At a separate covert location, CS-1 was provided $1500.00 OAF in order to purchase the heroin/fentanyl and equipped with a covert transmitting/recording device. Followed and observed by investigators, CS-1 traveled directly to **subject location 1** and **HARRIS** entered CS-1's vehicle. CS-1 and **HARRIS** traveled directly to **subject location 6**. Investigators observed **HARRIS** exit CS-1's vehicle and entered the side door, as before, to **subject location 6**. Several minutes later, **HARRIS** exited the same side door to **subject location 6** and reentered CS-1's vehicle. CS-1 and **HARRIS** departed the area with investigators covertly following CS-1's vehicle. Over the transmitting equipment, I overheard **HARRIS** directing CS-1 to drop her (**HARRIS**) off on Barrett (**subject location 2's**

45

**street**.)  Investigators followed and observed CS-1 arrived to the area of 3200 Barrett (the block of **subject location 2**) and observed **HARRIS** exit CS-1's vehicle.  Investigators then followed CS-1 as he/she left the area.

86.     Investigators then met CS-1 at an undisclosed location, where CS-1 relinquished the purchased fentanyl and covert transmitting/recording device.  CS-1 indicated **HARRIS** directed CS-1 to "nephew's" (**subject location 6**) when **HARRIS** entered CS-1's vehicle.  During the drive over to **subject location 6, HARRIS** indicated that "right now" if the CS-1 wanted any amount of fentanyl worth over $2,000, **HARRIS** would procure that amount at **subject location 2.**  Any amount of fentanyl worth less than $2,000 **HARRIS** would get at the other **subject locations,** such as **subject location 6**.  The purchased fentanyl was transferred to the DEA North Central Laboratory for analysis.  Results are still pending.

**S.     Training and Experience of the Investigative Team.**

87.     As part of my experience and training and that of other law enforcement officers participating in the investigation, we have accumulated information and training in the areas of narcotics based economic crime. I have had experience, as have other members of the investigating team, in interviewing defendants, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking.  Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing,

46

extensive distribution conspiracies involving large amounts of controlled substances and money, I am informed of the following:

a.      It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.      Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of controlled substances.  These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients.  The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

d.      Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with  persons known to traffic in

47

controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

      e.      Drug traffickers take or cause to be taken photographs of them, their associates, their property, cash and currency, firearms, and controlled substances. These traffickers frequently maintain these photographs in their residence or other buildings under their control.

      f.      Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

      g.      When drug traffickers amass large proceeds from the sale of controlled substances they attempt to legitimize these profits. I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts. They maintain record of these transactions in their residence or other buildings under their control.

      h.      It is common for drug traffickers to travel to major distribution centers, such as Texas, California and/or Mexico to purchase controlled substances and/or to arrange for its distribution elsewhere in the United States. After purchasing controlled substances, these drug

48

traffickers will transport or cause to be transported, controlled substances to the areas in which they will distribute the controlled substances.  The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers.  Records of travel are frequently kept in their residence or other buildings under their control.

i.      Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in controlled substances prosecutions.

j.      Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their cocaine and/or United States currency.

### CONCLUSION

**A.      Summary of the DTO's Operation and Use of the Subject Locations.**[19]

88.      Throughout the instant affidavit, I have detailed several members of this criminal organization and their use of the **subject locations** to supply the St. Louis Metropolitan area with fentanyl.  Investigators know from the court-authorized interceptions, surveillance, and controlled fentanyl purchases, that the **GRIFFIN DTO** is an extensive, long term, entrenched organization that has distributed large amounts of fentanyl throughout the St. Louis, Missouri area over a period

---

[19]      I have included this section for the limited purpose of highlighting some of the information contained in this lengthy affidavit.  This section is not intended to summarize all of the relevant information about the **GRIFFIN DTO**, its members, or the DTO's use of **subject locations 1, 2, 3, 4, 5, and 6** contained in this affidavit.

of years. The **GRIFFIN DTO** consists of **GRIFFIN**, the main source of supply, and distributors such as **HARRIS**, **Tyrone HARRIS**, Barnard REED, the unidentified distributor at **subject location 4**, **HARRIS**' "nephew," and others known and unknown.

89. As described herein, investigators have learned throughout the investigation that the **GRIFFIN DTO** has (or has had) access to numerous residences (**subject locations 1, 2, 3, 4, 5, and 6,** 3502 Natural Bridge, and 3966 Lexington) in the St. Louis area, which are utilized to distribute drugs and to store or conceal drugs and drug proceeds.

90. The **GRIFFIN DTO** has numerous lower level members who utilize one or more of the **subject locations** to distribute drugs and to store or conceal drugs and drug proceeds. **HARRIS,** who resides at **subject location 1,** is a distributor for the **GRIFFIN DTO**. As demonstrated through her numerous controlled sales to CS-1 and CS-2, she is able to acquire ounce-level amounts of fentanyl from **GRIFFIN**, **Tyrone HARRIS,** Bernard REED, the unidentified distributor at **subject location 4, HARRIS**' "nephew," and others. **HARRIS** has traveled to each of the **subject locations** on at least one occasion to procure the fentanyl to sell to CS-1. On several of these trips, **HARRIS** has also obtained extra amounts of fentanyl from **subject locations 2, 3, 4, 5** and/or **6**, transported that fentanyl back to **subject location 1,** and distributed that fentanyl from **subject location 1**.

91. Additionally, as discussed throughout the instant affidavit, investigators believe **GRIFFIN** has utilized, and continues to utilize, his profits from the sale of drugs to purchase residences, such as **subject locations 2, 3**, 3502 Natural Bridge, and 3966 Lexington, within the

City of St. Louis.  CS-1 has accompanied **HARRIS** to **GRIFFIN**'s **subject locations 2, 3**, 3502

Natural Bridge, and 3966 Lexington on multiple occasions from August of 2019 to August of 2020

to procure the fentanyl from **GRIFFIN** for **HARRIS** to sell to the CSs.  **GRIFFIN** utilizes these

residences as ever-changing "stash houses" to distribute and store drugs.  The tactic of constantly

changing "stash houses" is employed to thwart law enforcement the ability to detect, locate, and

raid the "stash house."  It is believed based on the information described in this affidavit,

**GRIFFIN** has transitioned his primary residence from **subject location 2** to **subject location 3**.

However, **subject location 2** is still being used as distribution house and **subject location 3** is

being used to store drugs, drug proceeds, and/or other records of drug trafficking.  Further,

although **GRIFFIN** no longer uses 3502 Natural Bridge for drug distribution, his renovation and

rental of that residence illustrates that **GRIFFIN** utilizes a specific residence for a short period of

time and then transitions to another residence to attempt to avoid law enforcement detection.  It

appears most recently that **GRIFFIN** has begun renovations on another property at 3966

Lexington as well.

  92. Further, the **GRIFFIN DTO** also employs other distribution houses, such as

**subject locations 4, 5, and 6**.  On October 6, 2019, after **HARRIS** filled CS-1's order from

**GRIFFIN** and REED on 3502 Natural Bridge, she traveled to **subject location 5** to deliver an

unknown amount of fentanyl to another **GRIFFIN DTO** distributor, **Tyrone HARRIS**, for him

to distribute.  On July 23, 2020, CS-1 requested a smaller amount of fentanyl than his/her earlier

larger purchases.  **HARRIS** contacted several other suppliers to fill CS-1's order.  Initially,

**HARRIS** attempted to contact her "nephew" at **subject location 6**. However, her "nephew" never answered the call and forced **HARRIS** to redirect and contact the other distributors within the DTO. First, CS-1 accompanied **HARRIS** to **subject location 4** where a portion of CS-1's order was filled. **HARRIS** and CS-1 then drove to **subject location 5**, **Tyrone HARRIS'** residence, to fill the rest of that order. After **HARRIS** had completed the fentanyl order for CS-1, **HARRIS** was able to eventually communicate with her "nephew" and directed CS-1 to transport **HARRIS** to **subject location 6** in order to procure fentanyl for **HARRIS'** own distribution supply. While at **subject location 6**, **HARRIS** acquired approximately ½ ounce of fentanyl from "nephew" within **subject location 6**. **HARRIS** repeated this behavior several times in late July / early August of 2020 to re-stock her own distribution supply from **subject location 6**. Further, as recently as July 29, 2020, investigators conducting surveillance of **subject locations 4, 5, and 6** continue to observe substantial foot and vehicle traffic that is consistent with drugs being sold out of those locations.

93.    Further investigatory operations in August of 2020 have continue to expose the **GRIFFIN DTO**'s use of multiple distributors and residences to fill drug orders. Based on the evidence gathered and **HARRIS**'s August 12, 2020 statements to the CS-1 that I overheard, the amount of the requested quantity of fentanyl determines which of **subject locations** that **HARRIS** utilizes to complete the sale. For example, on August 6, 2020, CS-1 requested a smaller amount of fentanyl, which allowed **HARRIS** to fulfill CS-1's order directly at **subject location 1**. However, when CS-1 requested a larger quantity of fentanyl on August 10, 2020, **HARRIS** was

forced to acquire a portion of the fentanyl order from **subject location 6** and the remaining amount directly from **GRIFFIN** at **subject location 2**. Further, during the August 6, 2020 fentanyl transaction, investigators overheard the conversation between CS-1 and **HARRIS** concerning the source of all the fentanyl purchased throughout the investigation. **HARRIS** plainly stated that she can use all of the **subject locations** to fill a specific order. However, all of the fentanyl purchased, regardless of which of subject location it comes from, is the same quality because **GRIFFIN** is the fentanyl supplier to all **subject locations**. Lastly, on August 12, 2020, **HARRIS** specifically stated to CS-1 that any amount of fentanyl requested worth over $2,000, **HARRIS** would get from **subject location 2**. Any smaller amount than that would come from the other **subject locations**, like **subject location 6**.

94.     Moreover, the investigation into the **GRIFFIN DTO** has revealed that **GRIFFIN** has the ability to acquire and distribute large amounts of fentanyl and invests in real estate properties throughout the St. Louis area. I know from experience working high-level drug dealers that often these individuals will launder their illicit proceeds from drug trafficking through real estate and/or business ventures. As such, investigators believe that **GRIFFIN** co-mingles his drug trafficking proceeds with his real estate properties and his businesses, which the investigation has discovered are registered under the business name "GRIFFIN Holding LLC."

95.     Based on the foregoing, I submit that this affidavit supports probable cause for a warrant to search each of the **subject locations** described and depicted in **Attachment A** and seize the items described in **Attachment B**.

**B.**   **Request for Sealing.**

96.   I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

**I state under the penalty of perjury that the foregoing is true and correct.**

08 17 2020
DATE

James D. Gaddy
Task Force Officer
Drug Enforcement Administration

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on August 17, 2020.**

SHIRLEY P. MENSAH
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

54

## ATTACHMENT A

*Properties to be searched*

**a.     Subject location 1 - 1319 14th Street, St. Louis, Missouri**:  **Subject location 1** is described as a single family apartment within the Preservation Square Housing Complex.  **Subject location 1** sits on the west side of the street with the front door facing east.  **Subject location 1** is made of brick construction.  The front door of subject location 1 is green with the address, "1319" is clearly posted on the door.  On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 1**.  The current utilities are subscribed to Sh'keena HARRIS, since November 2018.



2

      **b.**     **Subject location 2 - 3209 Barrett, St. Louis, Missouri**: **Subject location 2** is described as two story two family flat apartment. **Subject location 2** sits on the north side of the street with the front door facing south. **Subject location 2** is made of red brick construction and has a pitched roof. **Subject location 2** has a large covered front porch on the 2nd story. The address, "3209" is clearly posted on the brick to the left of the door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 2**. The current utilities are subscribed to **TyDarryl GRIFFIN**, since December 2016.



3

      **c.**     **Subject location 3 - 3212 Harper, St. Louis, Missouri**: **Subject location 3** is described as a two story single family residence. **Subject location 3** sits on the south side of the street with the front door facing north. **Subject location 3** is made of brick construction and has a flat roof. The front door of **subject location 3** is white with the address, "3212", is clearly posted to the left of the door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 3**. The current utilities are subscribed to Reginald GRIFFIN, since May 2017.



     **d.**     **Subject location 4 - 2329 University, St. Louis, Missouri**: **Subject location 4** is described as a two story single family residence. **Subject location 4** sits on the north side of the street with the front door facing south. **Subject location 4** is made of brick construction and has a flat roof. The windows to the east of the front door have white security bars on them and the front yard is surrounded by a black wrought iron fence. The front door of **subject location 4** is brown with the address, "2329" posted above the door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 4**. The current utilities are subscribed to Charles Henderson, since October 2009.



     **e.**     **Subject location 5 - 4430 San Francisco, St. Louis, Missouri**: **Subject location 5** is described as a single family residence. **Subject location 5** sits on the south side of the street with the front door facing north. **Subject location 5** is made of brick construction and has a pitched roof. The front door of **subject location 5** is dark in color with a white exterior door. **Subject location 5** has an attached garage to the east of the front door. The address "4430" is clearly posted to the left of the front door. On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of subject location 5. The current utilities are subscribed to Towanda Kent, since October 2014.



6

   **f.**   **Subject location 6 - 1521 East Gano Avenue, St. Louis, Missouri:   Subject location 6** is described as a single family residence.  **Subject location 6** sits on the north side of the street with the front door facing south.  **Subject location 6** is made of brick construction and has a pitched roof.  The front door of **subject location 6** is brown in color with no exterior door. **Subject location 6** has a side entrance on the east side of the residence.  The address "1521" is clearly posted to the right of the front door.  On August 11, 2020, an inquiry with the local utility company was made regarding the account holder of **subject location 6**.  The current utilities are subscribed  to  Malinda  Jones,  since  September  2016.



**ATTACHMENT B**

*Property to be seized*

1.  All records and information relating violations of Title 21, United States Code, Sections 841(a) and 846, that constitutes fruits, evidence and instrumentalities of violations those violations involving **TyDarryl GRIFFIN** and others occurring during the conspiracy, including:

    a.  Controlled substances;

    b.  Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

    c.  Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

    d.  Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

    e.  Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

    f.  Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

    g.  United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

    h.  Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

    i.  Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

    j.  Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or locations described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

    k.  Firearms and/or weapons.